Charles B. DAVIS and Billy R. COLLINS *v.* ARKANSAS STATE HIGHWAY COMMISSION

86-94                                    719 S.W.2d 694

Supreme Court of Arkansas
Opinion delivered November 24, 1986

*Walker, Snellgrove, Laser & Langley,* for appellant Charles Davis.

*Mooney & Boone,* for appellant Billy R. Collins.

*Thomas B. Keys, Robert L. Wilson,* and *Philip N. Gowen,* for appellee.

GEORGE ROSE SMITH, Justice. This is an action brought by the State Highway Commission to recover $409,887.50 which the Commission is alleged to have been fraudulently induced to pay to the two defendants, Charles B. Davis and Billy R. Collins. The defendants denied the charges of fraud, insisting that they had acted in good faith in their dealings with the highway department. The jury's verdict awarded the Commission the sum of $337,837.50, for which judgment was entered against Davis and Collins. Their appeal comes to us as a tort case. Rule 29 (1)(o).

The appellants' five points for reversal may be grouped as presenting essentially three arguments: The Commission did not prove actionable misrepresentations, the proper measure of damages was neither proved nor submitted to the jury, and the Commission failed to mitigate its damages. Ultimately all three

arguments present questions of law, none very difficult, but the facts must be narrated in some detail for an understanding of the ultimate issues.

The principal defendant, Davis, and his son had for some years been engaged as a partnership in the buying and selling of horses in Craighead County. Their operations were conducted on a 76-acre tract of land. The Highway Commission brought an eminent domain action to take about 8½ acres of the land for highway purposes. The land being taken included not only Davis's residence but also the barns, corrals, and other improvements used in his business as a horse trader.

The Commission, pursuant to federal regulations, has a program for relocating businesses that might otherwise be shut down as a result of condemnations for highway purposes. This program is administered by the department's Relocation Section, headed by Danny Arendt. Arendt explained the program, which may take either of two forms, but not both. The first choice is always to assist the owner to relocate his business, so that it may be continued in a new location with as little interruption as possible. If such a relocation cannot be accomplished, the alternative is to assist the owner in moving his commercial personal property to some other place while the business is being interrupted, after which the business will be resumed at or near its original site. The moving expenses to be paid by the Commission under this alternative may include payment for the storage of the personal property. Storage payments cannot continue for more than 12 months and must be made to a disinterested third person. The owner cannot be paid for storing the personalty on land that he owns or leases.

There is no dispute about the program itself, nor is it disputed that the Commission made payments totaling over $400,000 for the moving and storage of Davis's horses and equipment. The disputed issue is whether Collins, who boarded the horses and stored the equipment, was a disinterested third person, as the defendants contended at the trial, or was a "straw man" set up by Davis as a means of secretly channeling most of the money to himself, as contended by the Commission. The jury resolved that issue in favor of the Commission. We follow our usual practice of viewing the evidence in the light most favorable

to the appellee, resolving conflicts in favor of the verdict.

Darrell Hatchett, employed by the Commission as a Relocation Coordinator, was the plaintiff's principal witness with respect to the making of the storage contract. During Hatchett's first contact with Davis, in July, 1980, he explained the relocation program and gave Davis a relocation assistance brochure. In May, 1981, Hatchett again discussed the matter with Davis. At that time Davis was concerned about whether he would have to quit his business or go into storage. The initial plan was to try to get Davis back into business at another location. From May until October both Hatchett and Davis looked for a new location, but none was found.

On November 3 Hatchett and the Relocation Section decided that it was necessary to resort to the alternative, storage. Davis testified that on November 20 he knew that Hatchett was "leaning toward storage." On November 30 Hatchett and Davis reached a decision to store the horses. Davis said he would like to have a grand opening around the first of the year, but Hatchett explained that storage would not be for business purposes; the business could not be continued. Davis understood that. Hatchett also explained that the payments had to go to a third party. Davis understood that. Another Commission employee, Glendol Jackson, testified that Davis was told that the department had to deal with a bona fide third party. He and other witnesses testified that the department would not have entered into the storage contract if they had known that Collins was not a disinterested third party.

On the evidence as a whole the jury could find that Davis and Collins entered into a collusive scheme as early as the latter part of November. Hatchett and Davis were looking for a place to store the horses. Davis testified, as an adverse witness for the plaintiff, that on November 27 Collins asked Davis if he knew where Collins could borrow money for a down payment on a farm he had found. Collins, also an adverse witness for the plaintiff, testified that he heard that Darrell Qualls had some property for sale and went to see him. Qualls, apparently disinterested, testified that he had no idea of selling the property until Collins came out and asked him if he would sell it. Qualls said he would. The price was to be $50,000 minus a $22,000 mortgage: $28,000. There was no bargaining about the price. "He asked me what I

would take for it, and I told him, and that was it." Collins left to think it over, but he was back in three or four hours and agreed to buy. During those three or four hours Collins apparently went to see Davis about a loan, for both Davis and Collins testified that Davis agreed to lend Collins $28,000 to buy the Qualls property. There was no written agreement, but both said that Davis lent the money "provided that [Collins] would give the State the first chance to lease or rent the place to relocate [Davis's] business." Qualls executed the deed to Collins a few days later.

Davis testified that on December 10 he had 37 horses. He admitted that he increased his herd to 160 by the time the horses were moved on and after February 6, 1982, to the 26 acres that Collins had bought from Qualls. There was no testimony that Davis had ever before had that many horses. Davis's son testified that on February 1 he bought 36 horses in Como, Mississippi, before he had "actual" knowledge the next day that "we were going into storage." Robert Lipscomb, the horse and cattle dealer in Como, testified that Davis normally bought one or two horses at a time, but on December 1 Davis Jr. bought 21 horses for $9,020 and on February 1 he bought 36 horses for $14,822. One of the horses had a bad eye and was good only to be sold to the slaughterhouse. Some of the others were inexpensive horses, the lowest price being $160, and others were expensive, the highest being $635.

Davis admitted that on January 11, 1982, he opened a joint bank account in the name of Collins and Davis's son-in-law, Glen Patterson. Patterson had nothing to do with the account. All the Commission's checks were deposited in that account; all the checks on the account were written by Collins. A CPA who examined the account testified that $214,873.36, about 63% of the total, was paid to Davis.

The storage agreement was an oral one, made by Hatchett and Davis. Neither Hatchett nor Arendt, who were acting for the Commission, had any knowledge of horses or of a proper charge for their storage, facts which Davis must have known. Arendt and Hatchett had obtained only two bids for storage, one from Little Rock for $200 a month and another for $250, but both included grooming and exercising the horses. There was testimony that a horse could be stabled and fed for $90 a month.

▆ The oral storage agreement made with Davis was for $225 a month per horse, plus $1,825 a month for the storage of equipment. Hatchett had expected the number of horses to be about 75, but Davis had increased his herd to 160 horses when the agreement went into effect on February 2. The Commission honored its agreement, paying Collins $36,000 a month for boarding the horses plus $1,825 for the gear, or a total of $37,825 a month, for ten and a half months. Unquestionably Hatchett and Arendt were naive, misguided, perhaps foolish, in entering into the agreement. Even so, Davis and Collins were not entitled to cheat the Commission. In Justice Holmes's terse sentence: "Men must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R.* v. *United States*, 254 U.S. 141 (1920). There the Court was referring to the federal government, but we have applied Holmes's statement in our own law. *State, Use Miller County* v. *Eason*, 219 Ark. 36, 47, 240 S.W.2d 36 (1951).

Although Davis had financed the purchase of the Qualls property about December 1 and had opened the bank account on January 11, it was not until January 26 that Davis called Hatchett and said he had found a place to store the horses. He said the man was Billy Collins. Hatchett testified that he asked Davis if he knew Collins, and Davis said, "[N]o, that he knew of him." Collins likewise told Hatchett that he "knew of" Davis, when Hatchett called Collins that evening. In truth, the men had known each other for 40 years.

The oral agreement went into effect six days later, on February 2. Davis had all 160 horses moved by February 19. In view of the collusion already existing between Davis and Collins, the jury probably did not believe Davis's testimony that Collins was "shocked and surprised" when he found there were 160 horses to be boarded nor Collins's statement that he at once told Davis he could not care for that many by himself and on the spot employed Davis at $10,000 a month to be responsible for the horses and necessary labor. Collins said he agreed to pay all the other expenses, and did so. There was apparently very little labor. The veterinarian testified that the horses did not appear to have been groomed or brushed. Hatchett visited the place from time to time and never saw anyone grooming the horses, exercising them, or doing anything else. Hatchett was probably right in saying about the horses: "They were just there." Davis testified that he

lost money in accepting employment for $10,000 a month, though his explanation was not convincing. The jury evidently preferred to believe the partnership income tax return, which showed that Davis's participation in the storage agreement resulted in a net profit of $91,170, after all deductions.

Arendt and Hatchett had expected Davis to have his barns and other improvements rebuilt by April 1, but Davis apparently delayed completion as long as he could, to keep the horses in storage. When Arendt finally decided that Davis was dragging his feet, an ultimatum was given to Davis on October 7, cutting his storage payments in half. Davis then sold all his horses by about December 1 and removed his equipment by December 15. We should add that although the Commission could have terminated the agreement at any time, Davis was forbidden to sell any of his horses while they were in storage. Whether he wanted to sell any of them was a matter for the jury to consider.

■ In view of the foregoing facts, the points of law do not require much discussion. The appellants argue that the Commission failed to prove that it relied upon Davis's misrepresentations, Hatchett having made his own investigation of proper storage charges, and that any false representations were not actionable because they were made after the contract had been agreed upon. Both arguments ignore the Commission's theory of recovery. The complaint did not allege misrepresentation. To the contrary, it alleged concealment: that Davis had set up Collins as a straw man because Davis knew that the Commission would not have made or performed the agreement had it known that Davis was in reality a party to the agreement. There is an abundance of evidence to support the Commission's theory, which the jury obviously accepted.

The third point is that the Commission failed to submit evidence of what is argued to be the correct measure of damages, the difference between the amount paid and the proper cost of performance. The fourth point is that the court erroneously instructed the jury that the measure of damages was the amount paid to Collins.

■■ Neither argument can be sustained. At the request of the plaintiff the court instructed the jury that if they found for the plaintiff, they should award the amount of money that would

fairly and reasonably compensate the plaintiff for any damage sustained which was caused by the fraud and deceit of the defendants or either of them. Also, that the measure of plaintiff's damage was the recovery of funds paid by plaintiff to Collins. Under Civil Procedure Rule 51, a general objection to an instruction is not sufficient; a specific objection is required. In this case the defendants did not make either a general or a specific objection to the instruction given by the court. Instead, the defendants submitted an instruction of their own, which the trial court refused to give. The submission of a correct instruction would of course have served as a proper objection to the plaintiff's requested instruction, but the trouble is that the defendants' proposed instruction was not a correct statement of the law. It read in part:

> If you should find for the plaintiff in this case, the measure of damages is the difference between the price the plaintiff would have been required to pay *for the storage of the horses* [our italics] if it had not received any statements from [defendants] and the price which was paid to them in reliance upon their statements.

We have italicized a fatal flaw in the proffered instruction. The reference to the storage of *the horses* necessarily meant all 160 horses, even though the jury might believe that Davis had wrongfully expanded his herd in order to pyramid the excessive storage charges. If we assume that the appellants' theory is sound, a correct instruction would nevertheless have limited the recovery to the storage of the number of horses that were reasonably needed in Davis's business. The trial court's refusal to give an incorrect instruction is not error. *Kanis* v. *Rogers*, 119 Ark. 120, 177 S.W. 413 (1915).

The appellants' last argument is that the Commission's failure to mitigate its damages in specified possible ways is a basis for reversal. The defendants did not plead a failure to mitigate damages, did not raise it during the trial, and did not request an instruction on the subject. We do not consider arguments raised for the first time on appeal.

Affirmed.